**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____ :
                                        :
ALAN H. DUGAN, et al.,                  :        CIVIL ACTION
                    Plaintiffs,         :
                                        :
            v.                          :        No. 2:09-cv-5099
                                        :
TOWERS, PERRIN, FORSTER & CROSBY,       :
INC., et al.,                           :
                    Defendants.         :
_____:


**Goldberg, J.**                                      **December 11, 2012**

<u>**Memorandum Opinion**</u>

In this consolidated action, Plaintiffs, former shareholders of Towers, Perrin, Forster & Crosby, Inc. ("Towers Perrin"), allege that the June 2009 merger with publicly-owned Watson Wyatt Worldwide, Inc. ("Watson Wyatt") violated Towers Perrin's promise to Plaintiffs that it would remain privately held in perpetuity. Plaintiffs have brought claims for breach of contract, breach of trust, breach of fiduciary duty, promissory estoppel and unjust enrichment.[1]

Presently before the Court is Defendants' motion for summary judgment, which asserts that Plaintiffs have failed to establish an enforceable promise that Towers Perrin remain privately held. For the reasons that follow, we agree with Defendants and find that Plaintiffs' claims fail as a matter of law.

**I.      Factual and Procedural History**

Towers Perrin was an international professional services firm specializing in human resources

---

[1]Plaintiffs' claim for "constructive trust" was previously dismissed under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 34.)

1

and financial consulting. (SOF ¶ 2.) The firm was first incorporated in Philadelphia in 1934, and grew to be one of the world's largest business consulting firms. On January 1, 2010, Towers Perrin and Watson Wyatt merged to form Towers Watson & Co. ("Towers Watson"), a publicly-traded consulting company. (Pl. RSOF ¶ 4.1-4.2.)

From its incorporation until its merger with Watson Wyatt, Towers Perrin was owned exclusively by active employees. (SOF ¶ 2.) The record generally reflects that management believed that private ownership was important to the firm's independence and ability to objectively serve its clients. (See, e.g., Q. Smith Tr., Pl.'s Resp. Ex. 122, pp. 2-3.) Outside ownership, on the other hand, carried the potential for conflicts between shareholders' interests and those of the firm's clients. (Id.)

Towers Perrin furthered its private-ownership philosophy by selling stock to select employees, known as "Principals," and requiring those employees to resell their shares back to the firm upon separation. In order to ensure that Towers Perrin would always have sufficient funds to repurchase shares from retiring Principals, stock was bought and sold at book value,[2] far less than the price which could have been obtained in the open market.[3] (Pl. RSOF ¶¶ 8-9, 29.) When Towers Perrin offered stock, the Principals were permitted to buy that stock at book value in exchange for a promise by the Principals to resell their shares to the firm at book value upon retirement. Plaintiffs'

_____

[2]"The term 'book value' as applied to corporate stock, ordinarily means the net value, as shown on the corporate books, of all the assets of the corporation after deducting all its liabilities." Schaffer v. Below, 174 F.Supp. 505, 519 (D.V.I. 1959), aff'd, 278 F.2d 619 (3d Cir. 1960) (citing annotation). Plaintiffs allege that the book value at which they sold their shares was less than the fair market value of those shares at the time of the sale. (SOF ¶ 8.)

[3]Additionally, Towers Perrin would periodically recapitalize its shares in order to keep the price of voting common stock low. Essentially, Towers Perrin would exchange a portion of common stock for non-voting preferred stock, thereby decreasing the value of a share of common stock. This process allowed Towers Perrin to offer new Principals common stock at a reasonable price. (See 1998 Principals' Manual, Ex. 80, pp. 14-15.)

case hinges on the premise that underlying this arrangement was an additional promise by Towers Perrin to remain employee-owned indefinitely.[4]  (Pl. RSOF ¶ 9.)

For a great deal of Towers Perrin's history, the philosophy that stock be employee-owned was embodied in written stockholder "Trust Agreements" ("Shareholders Agreements").  The first Shareholders Agreement was executed in 1935, and prohibited any transfer of stock without authorization by a majority of shareholders.  (1935 Agreement, Ex. 111, ¶ 19.)  Even with majority approval, a Principal was permitted only to "assign and transfer to any other person in the employ of the [firm] any portion of his interest."  (Id.)  The terms of the 1935 Agreement could be amended or terminated "by a written two-thirds vote of all the [Principals]," subject to the rights of retired Principals to receive payment for previously-redeemed shares.  (Id., ¶ 22.)  The Shareholders Agreements were signed by all Principals, set forth their relative ownership interests in the firm, and were revised whenever a new Principal was sold shares of the firm's stock. (See id., ¶ 16.)  There were many subsequent revisions of the Shareholders Agreements, but each one contained the same transfer restrictions and amendment provisions as the 1935 Agreement.  (SOF ¶¶ 249-255.)

In the 1970s, ownership of Towers Perrin ceased to be governed by a single written Shareholders Agreement.[5]  In 1974, the board of directors voted to incorporate the provisions of the amended 1960 Shareholders' Agreement into Article VI of the Towers Perrin Bylaws ("Bylaws"). (Exs. 46-47.)  Article VI, which remained substantially unchanged until the merger, provided that

_____

[4]We note that Plaintiffs dispute that the promise to remain privately held endures "forever" or "in perpetuity."  (RSOF ¶ 9.7.)  However, Plaintiffs have not identified any circumstances which would allow Towers Perrin to terminate private ownership without violating the promise they allege it made to former shareholders.

[5]It appears likely that this change was brought about by the increasing number of shareholders.  Between 1960 and 1970, the number of Principals grew from 24 to 93, and by 1987, Towers Perrin had over 500 Principals.  (Ex. 131, Resp. Exs. 300-301.)

"[o]n the effective date of retirement (whether Normal or Other) each Shareholder will sell, and the Corporation will purchase, all stock of the Corporation then owned by such Shareholder, the total purchase price for each share of Common stock to be equal to the book value per share thereof." (Jan. 3, 2006 Bylaws, Ex. 88, Art. VI, § 6.15.)  Article VI was "binding on the Corporation, [and] all Shareholders of the Corporation," and stated that its provisions could be amended or terminated only upon the written approval of "the owners of two-thirds of the shares of the Corporation . . . subject to the fulfillment of any obligations of the Corporation and Shareholders to any former Shareholder, or his estate, whose stock has theretofore been sold pursuant to the provisions" of Article VI.  (Id., §§ 6.22, 6.27.)

Following the discontinued use of a single Shareholders Agreement, and throughout the time period relevant to Plaintiffs' claims, Towers Perrin offered to sell stock to new and existing Principals through "Stock Offer Letters" (alternately "Letters").  (SOF ¶ 277.)  The Stock Offer Letters set forth "the terms on which Towers Perrin" offered to sell stock to Principals.[6]  (See May 1, 1998 Letter, Ex. 166, p. 1.)  The Letters included the number of shares being offered, the price per share, and instructions for accepting the offer and providing payment for the shares.  (See, generally, Ex. 166.)  Under a section titled "Shareholder Covenants," the Stock Offer Letters also contained information regarding the rights and obligations of Towers Perrin shareholders.  (May 1, 1998 Letter, p. 2.)  This section suggested that Principals "read Towers Perrin's Bylaws carefully, particularly Article VI which deals with stock ownership, so you re-familiarize yourself with the rights and responsibilities of Towers Perrin Shareholders."  (Id.)  Importantly, the letters stressed that, "[b]y

---

[6]The precise language used in the Stock Offer Letters varied over the years, but not in any material way.

purchasing the shares of Towers Perrin stock offered by this memorandum, you agree to be bound by the provisions of the Bylaws (including any future amendments)." (Id.) Neither the Stock Offer Letters nor the Bylaws contained a written promise by Towers Perrin to remain privately owned.

The Stock Offer Letters written after 1989, in a section titled "Information About Towers Perrin," also mentioned the "Principals' Manual," a pamphlet drafted that year that was provided to Principals and updated periodically. These Letters informed Principals that the "Manual should contain copies of the firm's Articles of Incorporation and Bylaws as amended and restated." (Apr. 15, 1999 Letter, Ex. 166, p. 1.) The Principals' Manual is not mentioned anywhere else in the Stock Offer Letters, and is noticeably absent from every section covering the terms of stock purchase, and the resale obligations of the Principals.

In addition to containing copies of the Articles of Incorporation and Bylaws, the Principals' Manuals provided a short summary of the Bylaws. The Manuals described Article VI of the Bylaws as covering "share repurchase provisions," "shareholder covenants that apply upon cessation of employment," "the rules for share valuation," and "[s]pecial amendment requirements that apply to the provisions of" Article VI. (1989 Principals' Manual, Ex. 80, p. 23.)

The purpose of the Principals' Manuals was also to provide "basic information about the privileges and responsibilities of a Towers Perrin principal." (Id., p. 3.) The Manuals explained that "Towers Perrin is committed to private ownership," which, according to the Manuals, was "the best vehicle through which our employees can objectively and effectively meet client needs," and offered "key employees the opportunity for ownership in the organization and a heightened sense of involvement." (Id.) The Manuals further described that private ownership continued the "collective commitment (honored by all past generations of principals) to continued employee ownership of the

firm." (Id., p. 14.) The Manuals noted that "[t]he founders of the firm and succeeding principal groups have foregone substantial opportunities for financial gain to ensure continued employee ownership by future principals. They believed strongly in this moral compact, and they expected their successors to do so as well." (Id.)

The Principals' Manuals identified "four requirements" crucial for the "moral compact" to endure: (1) Principals "must resist the temptation to enrich themselves through a public sale of their shares at the expense of future generations;" (2) maintenance of "reasonable profit levels, developing a base of net worth that can overcome short-term business variability;" (3) "[s]hare valuation must remain at net book value, so that the firm and future principals can readily redeem the shares of terminating principals;" and (4) "[o]utstanding shares must remain widely distributed among employees of the firm." (Id., p. 14.)

The Principals' Manuals were distributed at Principals' meetings where Towers Perrin's senior management explained the rights and obligations of shareholders. At these meetings, "senior executives . . . communicated to the new Principals that when they bought Towers Perrin shares, the new Principals were agreeing to support the Firm's commitment to continued employee ownership and that by becoming a Principal, you were giving up your right to realize the market value of your shares." (Frank Decl., ¶ 5.) Mariano Leo, Vice President of Finance, described the presentations he gave to new shareholders between 1978 and 1990 as follows:

> During these presentations . . . I explicitly reiterated [Towers Perrin's] promise to shareholders that Towers Perrin was committed to private ownership by active employees, and I explained that (1) principals were given the opportunity to purchase shares inexpensively at book value in exchange for participating in the commitment to private ownership and agreeing to sell those shares back to the Firm at book value upon retirement, and (2) that book value was set at a fraction of the value that could have been achieved

> by public sale of the firm, in order to enable young new principals to
> buy shares and therefore continue private ownership of the Firm.

(Leo Decl. ¶ 5.)[7]

Ownership of Towers Perrin continued in this fashion, with Principals buying shares at book value and reselling those shares to Towers Perrin at book value upon retirement, until 2005. In April of that year, Defendant Mark Mactas, then Chief Executive Officer of Towers Perrin, announced at a Principals' meeting that a public sale was being considered. (Mactas Dep., Ex. 19, p. 149.) Following this announcement, there was concern that Principals would delay normal retirement in order to participate in the firm's initial public offering (IPO), which would allow them to sell their shares at market value, rather than at book value upon retirement. (Guinn Dep., Ex. 211, p. 216.)

In order to encourage people to continue to retire at a normal age, in 2006 Towers Perrin instituted a Voluntary Separation Program (VSP), whereby eligible Principals who agreed to retire and sell their shares to the firm at book value would receive $200,000, and the right to purchase discounted shares of Towers Perrin stock if an IPO occurred within three years of their retirement. (Pl. RSOF, ¶ 328.) Participating Principals were also required to execute "General Releases" waiving any legal claims against the firm. (Id., ¶ 329; Ex. 329, p. 4.) Although some employees elected to participate in the VSP, there was a precipitous drop in retirement following the

---

[7]Other evidence submitted by Plaintiffs confirms Leo's description of the Principals' meetings. For example, Plaintiff John Lynch, Chief Executive Officer of Towers Perrin from 1991 to 2000, stated that he was told at these meetings that "each principal was obligated to support" Towers Perrin's committment to private ownership, that "new principals had the opportunity to purchase shares inexpensively at book value," but "upon separation . . . [they] were also required to sell their shares back at book value," which was "a fraction of the value that could have been achieved by public sale of the firm." (Lynch Decl. ¶ 3.) According to Lynch, Principals were told that this arrangement was necessary to "enable the firm to redeem the shares of retiring principals so that the firm could remain in private employee ownership and to enable new principals to buy shares at an affordable price." (Id.; see also Pl. RSOF ¶ 9.)

announcement that an IPO was being considered. (Ex. 296, p. 16.)

In Spring 2008, Towers Perrin began preliminary discussions with Watson Wyatt regarding a possible merger. (Ex. 258, p. 4.) Those discussions continued through 2008, and into 2009. On June 26, 2009, by unanimous vote of the boards of directors, the two firms agreed to combine in a "merger of equals," whereby the shareholders of each company would have an equal ownership interest in the combined company, Towers Watson. (Nov. 9, 2009 Joint Proxy Statement, Ex. 183.) Under the terms of the merger, Towers Perrin common stock would be converted to Towers Watson stock and listed on the New York Stock Exchange and NASDAQ Global Select Market. (Id.) The merger required amendment of the Towers Perrin ownership restrictions contained in Article VI of the Bylaws, which could only occur upon written approval by two-thirds of the shareholders. (Id., pp. 10-11; 2006 Bylaws, Art. VI, § 6.22.) On December 18, 2009, at a special meeting of Towers Perrin shareholders, the merger was approved with 97% of the shares voting in favor of amending the Bylaws and adopting the June 26, 2009 Merger Agreement. (Ex. 168.)

Between November 11, 2009, and January 15, 2010, Plaintiffs, all former shareholders of Towers Perrin, filed three separate complaints challenging the propriety of the merger.[8] The Dugan complaint asserts claims on behalf of former Towers Perrin shareholders who separated from the firm on or after January 1, 1971. (Dugan Compl., No. 09-cv-5099, Doc. No. 1, ¶ 44.) The Pao complaint was filed on behalf of former shareholders who sold their shares specifically in connection with the creation of ExcellerateHRO, a 2005 joint venture between Towers Perrin's Administration Solutions and Electronic Data Systems Corporation. (Pao Compl., No. 10-cv-207, Doc. No. 1.) Finally, the Allen complaint, as amended on August 29, 2011, asserts claims by shareholders who retired in mid-

_____

[8]On January 20, 2010, the Court consolidated the actions pursuant to Federal Rule of Civil Procedure 42(a). (Doc. No. 18.)

2005, just prior to Towers Perrin's announcement that it was considering a public sale.  (Am. Allen Compl., Doc. No. 90, ¶ 7.)

Each complaint asserts claims against Towers Perrin, and the directors and officers who were in place at the time of the merger.  Plaintiffs have alleged claims for breach of contract, express trust and fiduciary duty, as well as for promissory estoppel and unjust enrichment.  Plaintiffs assert that by amending the Bylaws, and agreeing to a merger that resulted in the public sale of stock, Towers Perrin and its shareholders breached a legal obligation to Plaintiffs to maintain Towers Perrin as an employee-owned firm.  (Pl.'s Opp. Mem., p. 1.)  More specifically, Plaintiffs assert that upon becoming Principals, they and Towers Perrin agreed to be bound by the following set of obligations:

> (1) New and existing Principals had the right to purchase shares at book value, which was a fraction of their potential market value;
>
> (2) Each Principal agreed to forgo the opportunity to enrich himself, and instead, upon retiring, sell his shares back to Towers Perrin for book value, which was a fraction of the potential market value; and
>
> (3) Towers Perrin and each Principal agreed to keep the firm employee owned.

(Pl. Opp. Mem., p. 7.)

It is the third of these obligations which Plaintiffs assert was breached by the merger, and which Defendants challenge in their summary judgment motion.  Plaintiffs assert that this promise was communicated orally at Principals' meetings, and in more informal settings, and that this promise is evidenced by statements in the Principals' Manuals.  Plaintiffs contend that they relied upon Towers Perrin's commitment to continued private ownership when they agreed to purchase shares, and when they retired and sold their shares back at book value.

Plaintiffs also point out that the shareholders who voted for the merger were equally bound

by these obligations, and they were required to sell their shares at book value upon retirement to further continued private ownership. Plaintiffs allege that these shareholders nonetheless voted for the public sale, allowing them to sell at market value shares they had purchased at discounted book value. (Id., p. 5.) Plaintiffs assert that these shareholders were unjustly enriched by this windfall, which was possible only because of the contributions of previous shareholders and their agreement to forego similar opportunities to perpetuate employee ownership.

Defendants respond that there is no evidence of a legally-binding promise by Towers Perrin to keep the firm privately owned in perpetuity. Defendants argue that Article VI of the Bylaws, which does not contain any promise to remain private, and permits amendment by a two-thirds vote of the shareholders, constitutes the complete agreement between Towers Perrin and the Principals regarding the rights and obligations of stock ownership. As such, Defendants assert that Plaintiffs' evidence of oral representations are barred by the parol evidence rule.

Regarding the Principals' Manuals, Defendants posit that this document is not part of the parties' agreement, speaks only to "moral" obligations and was not approved by the board of directors. Defendants urge that neither the oral statements identified by Plaintiffs, nor the statements in the Principals' Manuals, constitute an enforceable promise to remain private. Rather, Defendants assert that these statements merely informed shareholders of the firm's policy of private ownership, which was the basis for selling stock to Principals at book value in exchange for their promise to sell that stock back to the corporation at book value upon retirement.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to produce sufficient evidence to allow a reasonable jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## III. Discussion

Before examining the parties' respective arguments in detail, we first set forth our view of the fundamental structure of the contractual relationships at issue. Plaintiffs repeatedly refer to a "collective commitment," or an agreement "among shareholders," and urge that each "generation" of shareholders owed a contractual duty to both previous and future "generations" to maintain private ownership of the firm. Defendants dispute the existence of an agreement between shareholders, and urge that the only binding contract is between Towers Perrin and individual shareholders, and that the terms of this contract are contained in Article VI of the Bylaws. According to Defendants, the individual Stock Offer Letters are a "separate or subsidiary contract." (Oral Arg. N.T., 6/19/2012, p. 8.)

We disagree with Defendants only to the extent that we find the governing contract to be the Stock Offer Letters, which incorporate Article VI of the Bylaws, and conclude that the evidence in this case demonstrates the existence of a series of separate contracts between each shareholder and

Towers Perrin. Simply stated, there is no evidence of an agreement between the individual shareholders who are parties in this case. While shareholders agreements existed early in Towers Perrin's history, neither Plaintiffs nor Defendants were signatories to those agreements. The Shareholders Agreements were subsequently replaced by and the Stock Offer Letters and Article VI of the Bylaws, which form the only binding written basis for the relationship between Towers Perrin and each individual shareholder for the time period relevant to Plaintiffs' claims.

More specifically, the issuance of individual Stock Offer Letters by the firm for each sale of stock to a Principal demonstrates multiple contracts between individual shareholders and Towers Perrin. Article VI of the Bylaws, referenced in each Stock Offer Letter, provided for Towers Perrin to repurchase the shares from those individuals upon retirement, at least until the merger. While the terms of each of these agreements may have been materially identical, the contractual relationship between each Principal and Towers Perrin was separate. Importantly, there is insufficient evidence to establish a contractual relationship between shareholders. With this context in mind, we consider Plaintiffs' proffered evidence regarding the terms of those alleged agreements and the promises made by Towers Perrin.

### A.       Breach of Contract Claim

It is undisputed that Towers Perrin, through its merger with Watson Wyatt, is no longer privately owned by existing employees. Plaintiffs' breach of contract claim therefore depends upon their ability to point to sufficient evidence that Towers Perrin made an enforceable promise to remain private. Plaintiffs concede that there is no written agreement that contains such a promise. Instead, Plaintiffs rely upon various oral communications and statements contained in the Principals' Manuals. We find this evidence to be insufficient to withstand summary judgment.

Plaintiffs' breach of contract claim is premised on allegations of both oral and written promises. "When, [as in this case], the parties to an agreement reduce their understanding to a writing that uses clear and unambiguous terms," interpretation of the written agreement is a matter of law for the court to decide. Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co., 610 F.2d 1174, 1178 (3d Cir. 1979). As it relates to Plaintiffs' allegations that oral statements make up part of the overall agreement that Towers Perrin remain private, "the question of whether an undisputed set of facts establishes a contract is a matter of law." Quandry Solutions, Inc. v. Verifone, Inc., 2009 WL 997041, at * 5 (E.D. Pa. 2009) (quoting Mountain Props., Inc. v. Tyler Hill Realty Corp., 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001)). However, where the facts are genuinely in dispute, and Plaintiffs have produced sufficient evidence to permit a jury to find in their favor, the question of whether a contract was formed is for the jury. Id. (quoting Ingrassia Constr. Co. v. Walsh, 486 A.2d 478, 482 (Pa. Super. Ct. 1984)). Thus, as applied here, Plaintiffs must have presented sufficient admissible evidence to permit a jury to find an enforceable promise by Towers Perrin to remain private.

For the reasons set forth below, we conclude that Plaintiffs' evidence of promises not contained in the Stock Offer Letters to be inadmissible. The Letters, which do not contain any promise to remain private, are writings which represent the entire agreement of the parties and bar consideration of promises allegedly made prior to their execution. Further, because the Stock Offer Letters required Principals to agree to redeem their shares at book value upon retirement, any promises allegedly made subsequent to their execution are unenforceable for lack of consideration. In any event, we find that the evidence identified by Plaintiffs, even considered in its entirety, fails to show that Towers Perrin made an actual binding promise to remain private. Rather, the evidence

13

of record only reflects that Towers Perrin was committed to the policy of private ownership, and, in order to implement that policy, offered to sell shares to Principals at book value in exchange for their promise to redeem those shares at book value upon retirement.

### 1. Promises Prior to the Execution of Stock Offer Letters Are Barred by the Parol Evidence Rule

Plaintiffs rely upon evidence of oral representations which they assert demonstrate that Towers Perrin, through its senior executives, promised to remain privately owned. Defendants respond that this evidence is barred by the parol evidence rule. We agree with Defendants insofar as those communications are alleged to have occurred prior to Plaintiffs' purchases of stock.

Under Pennsylvania's parol evidence rule, "[w]here the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement." Gianni v. Russell & Co., 126 A. 791, 792 (Pa. 1924) The rule applies only where there is "a writing that represents the 'entire contract between the parties.'" Id. at 436 (quoting Gianni, 126 A. at 792); see also Fountain Hill Millwork Bldg. Supply Co. v. Belzel, 587 A.2d 757, 761 (Pa. Super. Ct. 1991) ("the parol evidence rule has no application to a writing which does not state fully the entire agreement among the parties."); RESTATEMENT (SECOND) OF CONTRACTS § 209 (Parol evidence rule applies where "the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement."). Whether a particular writing represents the "entire contract" is a question of law to be decided by the court. Kehr Packages, Inc. v. Fidelity Bank Nat. Ass'n., 710 A.2d 1169, 1173 (Pa. Super. Ct. 1998). To make this determination, "the writing will be looked at, and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed"

that the writing represents the parties' entire agreement. <u>Gianni</u>, 126 A. at 792.

Where the court determines that a particular writing represents the parties' entire agreement, "previous oral or written negotiations or agreements involving the same subject matter" are inadmissible to explain, vary or supplement the terms of the written agreement. <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425, 436-37 (Pa. 2004). To determine if the writing and the parol evidence involve the same subject matter, "a comparison of both the alleged oral and written agreements must be undertaken and a determination made as to whether the parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made." <u>Greenberg v. Tomlin</u>, 816 F.Supp. 1039, 1053 (E.D. Pa. 1993). Where the two "relate to the same subject matter and are so interrelated that both would be executed at the same time and in the same contract," the oral statements must be considered covered by the writing. <u>Id.</u>

Defendants contend that Article VI of the Bylaws, which incorporates terms from the earlier written shareholders agreements, is the entire agreement between Towers Perrin and its Principals with regard to stock ownership. (Oral Arg. N.T., 6/19/2012, pp. 5-6.) They argue that the Bylaws therefore preclude consideration of the oral statements and portions of the Principals' Manuals identified by Plaintiffs.

While the Bylaws contain provisions which govern certain aspects of stock ownership, we do not agree that the Bylaws actually constitute a contract between the shareholders and Towers Perrin. Rather, we conclude that the Stock Offer Letters were the written agreement by which Towers Perrin sold stock to the Principals. Each Letter stated unequivocally that it "set forth the terms" of the firm's offer to sell stock to the Principal. (Ex. 166, p. 8.) The Letters also stated the number of shares being sold, the price per share, and instructions for acceptance of the firm's offer.

The Stock Offer Letters also provided information about Towers Perrin, and referred to the Articles of Incorporation.

Ultimately, however, this distinction makes little difference in that the Stock Offer Letters incorporate Article VI of the Bylaws by reference. It is well established that "the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document." WILLSTON ON CONTRACTS § 30:25. As long as the parties express their intention to have the document's provisions read into the contract, that document becomes constructively a part of the contract. Id. Here, the Stock Offer Letters state that "Article VI of the Bylaws governs the issuance and reacquisition of Towers Perrin stock by Towers Perrin and the rights and obligations of shareholders." (Ex. 166, p. 8.) This provision plainly expresses an intention to incorporate Article VI of the Bylaws as part of the contract, and its terms are therefore a part of the agreement set forth in the Stock Offer Letters.

When the provisions of Article VI are considered together with the other terms set forth in the Stock Offer Letters, all of the elements that would normally and naturally be included in an agreement governing the purchase and ownership of stock are present. The Letters are specific as to the stock being sold, the number of shares being offered, their price, and instructions for acceptance of Towers Perrin's offer. These instructions provide that the stock sale became complete upon execution of the Stock Offer Letters and payment for the shares. Further, by incorporating the Bylaws by reference, the Stock Offer Letters thoroughly explain the rights and obligations that accompanied stock ownership. In short, the Letters, along with the incorporated Bylaws, appear in every way to be the complete agreement between the parties as to the sale and ownership of stock, and preclude the examination of Plaintiffs' proffered parol evidence.

Plaintiffs offer four arguments as to why there is no "complete and exclusive" written contract barring the consideration of parol evidence. They assert that: (1) There is no integration clause; (2) Under § 6.22 of the Bylaws, any amendment to Article VI is ". . . subject to the fulfillment of any obligation of the corporation and shareholders to any former shareholder . . ." and the Bylaws do not specify what those "obligations" are; (3) The Bylaws do not "cover the right of Principals to purchase stock at a highly discounted price (book value), let alone the promise by Towers Perrin and each Principal to support continued private employee ownership;" and (4) Senior management discussed the rights and privileges of shareholders at Principals' meetings and in the Principals' Manuals. (Pl. Opp. Mem., pp. 29-33.) None of these arguments are convincing.

First, "[w]hile the effect of an integration clause is to make the parol evidence rule clearly applicable, it is not required." Mellon Bank, 951 F.2d 1339, 1406, n. 6 (3d Cir. 1991). The Stock Offer Letters are comprehensive. They contain all of the terms normally included in a contract for the sale of stock, including the price, number of shares, means of acceptance, and details regarding the rights and obligations of ownership. The absence of an integration clause does not convince us that these terms are anything less than the "final and complete expression" of the agreement between Towers Perrin and its shareholders. Id.

Plaintiffs next rely upon § 6.22 of the Bylaws in support of their position that the Bylaws are not a complete statement of shareholder rights and obligations. This section states:

> 6.22 Amendment or Termination. Subject to the provisions of Section 6.14, the provisions of this Article VI may be amended or terminated on the approval in writing of the owners of two-thirds of the shares of the Corporation, exclusive of any shares of its own stock held by the Corporation. Notice of any such action, however, shall be given to all Stockholders. Such amendment or termination shall be subject to the fulfillment of any obligations of the Corporation and Stockholders to any former Stockholder, or his estate, whose stock has theretofore been sold pursuant to the provisions hereof. On the effective date of termination of the provisions of this

17

> Article VI all shares of stock deposited with the Custodian shall immediately be returned to the registered owners thereof unless otherwise indicated in the termination instrument.

(Jan. 3, 2006 Bylaws, Art. VI § 6.22.)  Plaintiffs argue that because amendment of the provisions of Article VI is "subject to the fulfillment of any obligations of the Corporation and Stockholders to any former Stockholder . . . .," there are necessarily obligations not contained in the Bylaws.  Plaintiffs contend that one such "obligation" is the alleged promise to remain private.  However, a fair reading of the Bylaws in their entirety belies Plaintiffs' position.

When Article VI is read as a whole, it is clear that the unfulfilled obligation referenced in § 6.22 is that of Towers Perrin to pay the retired shareholder for the shares sold back upon retirement.  Indeed, the provisions detailing the firm's obligation to pay for stock redeemed upon retirement explicitly contemplates the use of ongoing installment payments.  (See 2006 Bylaws, Art. VI, § 6.16 ("Payment for Stock following Retirement"), § 6.8 ("Payment for Stock Following Death")).  This interpretation is supported by the parallel provision in the Shareholders Agreements, which provided that amendment was subject "to the rights of a retired Participant or of the estate of a deceased Participant to receive the minimum payments outlined in paragraphs 32 and 34(d) [relating to payment for stock following retirement or death]."  (1935 Shareholders Agreement, ¶ 22.)  It appears quite plain then that § 6.22 refers to the same obligation, particularly given that Article VI was adopted in order to incorporate the provisions of the Shareholders Agreements.  (See Minutes of Directors' Meetings, Exs. 46-47.)

Plaintiffs' third argument essentially begs the question.  Plaintiffs assert that the absence of a written promise by the firm to remain private demonstrates that the writings do not represent the entire agreement between the parties.  This argument fails because it assumes that a promise to remain

private was actually part of the agreement. The parties could have easily included this provision in their written agreements, but chose not to. Similarly, Plaintiffs note that the writings at issue do not state that Principals are entitled to purchase shares at book value. However, there is no evidence indicating that Principals had such a right absent an offer by Towers Perrin to sell it to them at book value. We are not, as Plaintiffs suggest, prepared to assume the existence of these obligations, and then proceed to deduce from their absence in the written agreement that the writing is not the parties' complete agreement.

Finally, the fact that Towers Perrin's senior management discussed the privileges and obligations of stock ownership with Principals at meetings and through the Principals' Manuals does not demonstrate that the Stock Offer Letters represent less than the entire agreement. Although Plaintiffs argue to the contrary, none of the statements made at the meetings or in the Principals' Manuals are inconsistent with the contents of the written agreement. Rather, as discussed in more detail in § III.A.3, infra, the statements relied upon by Plaintiffs explain the purpose of the rights and obligations contained in the Stock Offer Letters and Article VI of the Bylaws. Specifically, the agreement by Principals to sell their shares at book value upon retirement in exchange for the opportunity to purchase those shares at book value was necessary to continue the then-existing policy of private ownership. This does not mean that Plaintiffs have pointed to sufficient evidence that the policy of private ownership was a binding promise made by Towers Perrin to its Principals. Rather, the statements at issue provide an explanation for the terms by which the firm agreed to sell its shares.

In summary, the Stock Offer Letters contain all of the terms "naturally and normally" included in an agreement governing the sale and ownership of stock. They are both complete and specific, particularly considering their incorporation of the Bylaws. Plaintiffs have failed to offer sufficient

19

evidence to overcome summary judgment.

We conclude that the Stock Offer Letters represent the parties' entire agreement with regard to the purchase and ownership of stock. The evidence that Plaintiffs allege establishes that Towers Perrin promised to remain private plainly concerns the same subject matter as the Stock Offer Letters—the sale and ownership of Towers Perrin stock. Such promises, which would represent a substantial and indefinite constraint on Towers Perrin is not a contractual term which "might naturally be omitted from" the written agreement. RESTATEMENT (SECOND) OF CONTRACTS § 216. Consequently, Plaintiffs' evidence of oral or written statements made prior to execution of the Stock Offer Letters is barred by the parol evidence rule.

### 2. Promises Subsequent to Each Stock Offer Letter Are Unenforceable for Lack of Consideration.

The conclusions reached above do not however end our analysis. Plaintiffs allege that oral promises were made at various times throughout the period between 1971 and the merger, including both before and after execution of the various Stock Offer Letters. The parol evidence rule does not bar consideration of statements which were made after a Principal and Towers Perrin executed a particular written stock purchase agreement. Nicolella v. Palmer, 248 A.2d 20, 23 (Pa. 1968) ("the parol evidence rule bars only prior or contemporaneous oral agreements, not subsequent ones.") Such statements would be considered subsequent oral modifications of the written agreement.

However, Plaintiffs face a separate, insurmountable hurdle regarding oral promises made after execution of the Stock Offer Letters in that such promises are unsupported by consideration. A "written agreement can be modified by a subsequent oral agreement provided the latter is based upon a valid consideration and is proved by evidence which is clear, precise and convincing." Pellegrene v. Luther, 169 A2d 298, 299 (Pa. 1961). Performance of a pre-existing legal duty which is not subject

to honest dispute is not consideration.  RESTATEMENT (SECOND) OF CONTRACTS § 73.

According to Plaintiffs, and as set forth in Article VI of the Bylaws, when Principals purchased shares at book value, they were bound to redeem those shares at book value upon retirement.   The Principals' agreement to redeem their shares at book value became legally binding when Principals purchased them.  That obligation is not disputed, and in fact is a key component of the contract alleged by Plaintiffs.  Such obligation therefore cannot be used as additional consideration for any subsequent promise by Towers Perrin.  Plaintiffs have not alleged any separate consideration for the alleged oral promise to remain private.  Therefore, any oral promises made after the execution of the Stock Offer Letters, are unsupported by consideration and cannot be the basis for a valid contract.

### 3. The Facts of Record Do Not Establish That Towers Perrin Ever Promised to Remain Private.

Aside from contract interpretation issues, Plaintiffs face a more fundamental problem.  The oral statements and sections of the Principals' Manuals upon which they rely are insufficient as a matter of law to establish that Towers Perrin promised that it would remain privately owned in perpetuity.  Rather, the evidence relied upon by Plaintiffs indicates only that Towers Perrin told its Principals that it was "committed" to a policy of private ownership, and that by accepting the offer to purchase shares at book value, the Principals were agreeing to support that policy by redeeming their shares at book value upon retirement.  Mere expressions of intention or policy such as these do not constitute an enforceable agreement.  Bogley's Estate v. U.S., 514 F.2d 1027, 1033 (Ct. Cl. 1975) (citing WILLSTON ON CONTRACTS § 26).

Plaintiffs principally rely upon their deposition testimony to support their assertion of a binding oral promise by Towers Perrin to remain private.  However, this testimony does not describe any instance where a Principal was promised that private ownership would endure indefinitely.  For

example, John Kneen testified that the purchase and sale price of the shares "tied together" with the "commitment to employee ownership." (Kneen Dep., Ex. 191, pp. 39-40.) Kneen was unable to recall, however, any conversation where he was promised that the firm would remain privately owned. (Id.) Similarly, Plaintiff Dugan was unable to recall a specific promise to remain private. He testified that in exchange for purchasing stock at book value, "which was a rather low value compared to the market value," he knew "that it would be sold back at book value." (Dugan Dep., Ex. 5, p. 22.) Dugan understood this arrangement to be a "key ingredient[] in remaining a privately held firm." (Id.)

We recognize that several Plaintiffs, when asked to describe the terms of the contract, testified that remaining employee owned was a "parallel part" of the agreement. (Kneen Dep., Ex. 191, p. 55; see also Southworth Dep., Ex. 196, p. 97 (Reflecting his understanding that Principals sold their shares back at book value "with a promise from the firm that they in turn will continue to stay privately held."); Block Dep., Ex. 2, p. 7 ("My understanding of our contract was that as a principal of the firm, I would buy and sell my shares at book value, and Towers Perrin would remain a privately held corporation."); Dubois Dep., Ex. 4, p. 75.)[9] However, Plaintiffs cannot defeat summary judgment by simply alleging that perpetual private ownership was a part of the contract. They must support that allegation with evidence of an actual binding promise. Plaintiffs have not identified any instance where a representative of Towers Perrin promised them that the firm would remain privately held in perpetuity.

---

[9]We also note that some Principals testified they believed that Towers Perrin's obligation to remain private arose at the time Principals sold their stock back to the firm. (See, e.g., Greene Dep., Ex. 192, pp. 30-31.) Plaintiffs similarly fail to identify any specific promises supporting this belief. Further, this testimony faces the additional problem of being contradicted by the objective evidence, including the Stock Offer Letters and the Principals' Manuals, both of which were given to the Principals when they purchased shares and set forth their obligation to resell those shares at book value upon retirement.

Neither do the Principals' Manuals set forth a binding promise to remain privately owned. Rather, the Manuals reflect only that Towers Perrin was, at that time, "committed to private ownership" as "the best vehicle through which our employees can objectively and effectively meet client needs." (1989 Principals' Manual, p. 6.) The Principals' Manuals do not describe this commitment as a contractual obligation, but instead refers to it as part of a "moral compact formed by the firm's founders and continued by their successors." (Id., p. 13.) "A 'moral compact' is an insufficient basis on which to seek legal redress." In re Ge-Ray Fabrics, Inc. v. Nobland Int'l, Inc., 2007 WL 646284, at * 1 (S.D.N.Y. Mar. 1, 2007) (warranty of goods was merely a moral compact, and not enforceable); see also Deeter v. Dull Corp., Inc., 617 A.2d 336, 341 (Pa. Super. Ct. 1992) (moral obligation insufficient consideration to render promise of surety enforceable) (citing Paul v. Stackhouse, 38 Pa. 302, 304 (Pa. 1861)). In short, the statements contained within the Principals' Manuals are not couched in promissory language, but merely set out Towers Perrin's policy underlying its decision to sell shares at book value and require their redemption at book value upon retirement.[10]

Indeed, the absence of a promise by the firm to remain private from the written documents at issue is consistent with the amendment provision in § 6.22 of the Bylaws. This section explicitly provided Towers Perrin's Board of Directors with the ability to amend the rights and obligations pertaining to stock ownership, or to terminate those rights and obligations altogether, as long as it first obtained the written approval of the owners of two-thirds of the firm's shares. This provision

---

[10]Towers Perrin's Merger Policy, which reflects a "concern" for "equitable treatment for present, past and future Towers Perrin stockholders," and states that mergers "should not jeopardize" the "basic policy" of employee ownership, is similarly insufficient to establish an enforceable promise. Estate of Bogley, 514 F.2d, 1027, 1034 (Ct. Cl. 1975) ("A gratuitous and unsolicited statement of policy or of intention . . . does not constitute a contract.").

conspicuously fails to mention the substantial limitation Plaintiffs allege, and Plaintiffs acknowledge that the firm's 2009 merger with Watson Wyatt complied with the requirements contained in § 6.22 of the Bylaws. (See Dugan Tr., Ex. 5, pp. 65-66.) The same amendment provision was in effect during Plaintiffs' tenures as shareholders, and similarly would have permitted Towers Perrin to merge with a publicly-traded firm during that period. (Id.)

Finally, we note that Plaintiffs argue in the alternative that there is "sufficient evidence to support the finding of a contract implied in fact from the parties' words, statements, and conduct." (Pl. Opp. Mem., p. 21.) An implied-in-fact contract is "a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and promise have not been verbally expressed." In re Penn. Cent. Transp. Co., 831 F.2d 1221, 228 (3d Cir. 1987). Plaintiffs attempt to argue the existence of an implied-in-fact contract does not advance their position because there is no dispute in this case as to the existence of a contract. The parties agree that there is an express, written agreement governing the sale and ownership of stock. The existence of that contract precludes Plaintiffs' implied contract claim. Baer v. Chase, 392 F.3d 609, 616-617 (3d Cir. 2004) ("There cannot be an implied-in-fact contract if there is an express contract that covers the same subject matter.")

**B.      Promissory Estoppel**

The absence of a promise to remain private is fatal to Plaintiffs' promissory estoppel claims as well. Promissory estoppel "allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise." Carlson v. Arnot-Ogden Memorial

Hosp., 918 F.2d 411, 416 (3d Cir. 1990).

We agree with Defendants' principal argument that the existence of a contract governing the sale and ownership of stock precludes Plaintiffs' promissory estoppel claim. Promissory estoppel applies "where the formal requirements of contract formation have not been satisfied." Id. (citing Cardmore v. Univ. of Pittsburgh, 384 A.2d 1228, 1233, n. 9 (Pa. Super. Ct. 1978). As previously discussed, there was a contract formed through an express agreement between Plaintiffs and Towers Perrin which governed the sale of stock to Plaintiffs, and which required Plaintiffs to resell their stock to the firm at book value upon retirement. The existence of that binding contract thus precludes any claim by Plaintiff that they relied upon a separate promise in fulfilling their contractual obligation.

Plaintiffs also argue that they relied upon a promise of perpetual private ownership in deciding not to join together with other Principals and vote to amend the Bylaws to permit a public sale. There is no evidence however that Plaintiffs were precluded from taking this course of action, and acting on behalf of Towers Perrin to release the Principals from the obligation to sell their shares back upon retirement. This argument also fails because Plaintiffs have not provided sufficient evidence to support the first element of a promissory estoppel claim: the existence of a promise. As discussed above, Plaintiffs' evidence does not show that Towers Perrin ever promised that it would remain committed to private ownership indefinitely.

### C.  Unjust Enrichment

Plaintiffs next claim that Defendants were "unjustly enriched" when they realized the market value of their shares without compensating former shareholders. (Pl. Opp. Mem., pp. 38-39.) This claim fails for several reasons. In Pennsylvania, "the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract."

Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006). Again, it is undisputed that the sale and ownership of Towers Perrin stock was governed by a binding contract. Further, to prove a claim of unjust enrichment, a plaintiff must show "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." Mitchell v. Moore, 279 A.2d 1200, 1203-1204 (Pa. Super. Ct. 1999) (quoting Schenck v. K.E. David, Ltd., 666 A.2d 327, 328 (Pa. 1995)). Plaintiffs have failed to show that they conferred a benefit on either the individual Defendants or Towers Perrin under unjust circumstances.

The "key inquiry in determining whether a Pennsylvania unjust enrichment claim may proceed is whether the defendant received a benefit *unjustly*, and [ ] while *direct* conferral of a benefit is not required, the relationship between plaintiff and defendant may not be too remote." Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F.Supp.2d 380, 444 (E.D. Pa. 2010) (emphasis original). Here, the alleged benefit conferred upon the individual Defendants was received from Towers Perrin, and not directly from any Plaintiff. We also note that a significant length of time, decades in some instances, may have passed between the sale of the stock by a Plaintiff to Towers Perrin, and the subsequent purchase of stock by an individual Defendant. For these reasons, we find the relationship between Plaintiffs and the individual Defendants to be too remote to support a claim of unjust enrichment.

Moreover, Plaintiffs have not alleged that the individual Defendants' receipt of stock at book value was in any way unjust. Indeed, Plaintiffs purchased their stock under the same circumstances as Defendants. Plaintiffs' objection instead concerns what Defendants did with their stock after receiving it, specifically, selling it to the public at market price. Such an objection does not make the

circumstances under which Defendants purchased their stock unjust, and cannot support a claim for unjust enrichment.[11]

Similarly, while Plaintiffs may object that Towers Perrin permitted subsequent shareholders to sell their shares on the public market, they have not alleged anything unjust about the circumstances under which Towers Perrin repurchased Plaintiffs' stock. Plaintiffs received book value for their shares upon retirement, the compensation to which they were entitled under the terms of their contract with Towers Perrin. Where a person transfers property pursuant to a contract with another, they are not entitled to compensation except as provided for under the terms of the contract "unless the transaction is rescinded for fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain." RESTATEMENT (FIRST) OF RESTITUTION § 107. Plaintiffs have not alleged fraud, mistake or duress. In light of the Court's finding that Towers Perrin never made a binding promise to remain private, it cannot be said that Towers Perrin failed to perform its part of the contract. As such, Plaintiffs' claim of unjust enrichment against Towers Perrin also fails as a matter of law.

### D.  Breach of Trust and Fiduciary Duty

Plaintiffs' claims of breach of trust and fiduciary duty cannot withstand summary judgment

---

[11]In light of our conclusion that Plaintiffs have not provided sufficient evidence to support the merits of their unjust enrichment claim, we need not address Defendants' argument that the claim is barred by Pennsylvania's four-year statute of limitations. (Def. Mem., p. 36, citing 42 Pa.C.S. § 5525(a)(4).) We note, however, that there is serious doubt that Plaintiffs' claims are timely in light of the undisputed facts that all Plaintiffs sold their shares more than four years prior to filing this action. An unjust enrichment claim "accrues when the defendant 'receives and retains benefits.'" Goldeman v. York Int'l Corp., 2011 WL 3330423, at * 4 (E.D. Pa. Aug. 3, 2011) (quoting Harry Miller Corp v. Mancuso Chems., Ltd., 469 F.Supp.2d 303, 319 (E.D. Pa. 2007)). This principal, in addition to bearing upon the timeliness of Plaintiffs' claims, emphasizes that a claim for unjust enrichment focuses upon the circumstances of a defendant's receipt of benefits rather than the defendant's subsequent use of those benefits.

because there is no evidence that a trust was created or that Plaintiffs were owed a fiduciary duty. Indeed, there is no evidence of any ongoing legal relationship between Plaintiffs and Towers Perrin after Plaintiffs sold their shares and ceased to be shareholders.

Under Pennsylvania law, breach of trust or fiduciary duty claims require a showing that there is a particular relationship between the parties. A trust is characterized by the entrustment of property by a principal in a trustee for the benefit of a third party. See In re Kulzer Roofing, Inc., 139 B.R. 132, 139 (Bankr. E.D. Pa. 1992) ("The elements of an express trust, as developed by Pennsylvania case law, are (1) an express intent to create a trust; (2) an ascertainable *res*; (3) a sufficiently certain beneficiary; and (4) a trustee who "owns" and administers the *res* for the benefit of another (the beneficiary)."). Pennsylvania law requires that, for a trust to be created, there must be "clear and unambiguous language or conduct" showing that a principal is passing title of property to a trustee for the benefit of a third party. Presbytery of Beaver-Butler v. Middlesex Presbyterian Church, 489 A.2d 1317, 1324 (Pa. 1985). A trust "cannot arise from loose statements admitting [of] possible inferences consistent with other relationships." Id.

The trust is one common example of a relationship that gives rise to fiduciary duties. As a more general matter such duties arise where the relationship between the parties is "characterized by 'overmastering influence' on one side or 'weakness, dependence or trust, justifiably reposed' on the other side." eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 23 (Pa. Super. Ct. 2002) (quoting Baile v. H & R Block, 777 A.2d 95, 101 (Pa. Super. Ct. 2001)).

Plaintiffs have not produced evidence showing the existence of a fiduciary relationship between the parties, as a result of the existence of a trust or otherwise. Indeed, the only evidence cited by Plaintiffs in support of such a relationship claim is metaphorical language contained in policy

statements by Towers Perrin. For instance, Plaintiffs rely upon the Afterward of the Principals' Manuals, which states, "In essence, the owners of Towers Perrin shares are recipients of a trust passed to them by their predecessors and stewards of that trust for their successors." (1998 Principals' Manual, Ex. 68, p. 26.) The words "in essence" plainly suggest that the proceeding phrase is meant as a metaphor, not literally.

Further, the language cited by Plaintiffs suggests that successor generations of shareholders, and not predecessors, are the ones owed fiduciary duties. Even accepting that this language gives rise to fiduciary duties, Plaintiffs, as predecessor shareholders, are not the parties owed those duties and therefore have no standing to claim that they were breached.[12] See RESTATEMENT (SECOND) OF TRUSTS § 200 ("No one except a beneficiary . . . can maintain suit against the trustee to enforce the trust.").

For these reasons, Plaintiffs' claims for breach of trust and fiduciary duty fail as a matter of law.

E.      The Pao Plaintiffs

Plaintiff Alice Pao was a Principal who worked in Towers Perrin's Administration Solutions division. (Pao Compl. ¶ 6.) In March 2005, Towers Perrin began a joint venture with Electronic Data Systems Corporation ("EDS") that involved combining the Administrative Solutions division with certain EDS businesses into a new company called ExcellerateHRO that was owned both by Towers Perrin and EDS. (Id.) As a result of the joint venture, Administrative Solutions employees were either transferred to ExcellerateHRO or their employment was terminated. Principals in the

---

[12]Similarly, Plaintiffs rely upon the following statement contained in the notes of a 2001 Principals' Orientation: "we lease the firm from our predecessors and prepare it for our successors." (Ex. 256, p. 4.) This sentence is both metaphorical and suggests that any duty of present shareholders is to their successors and not their predecessors.

Administrative Solutions division, like Pao, were required to sell their shares back to Towers Perrin at book value. Like the other Plaintiffs, Pao alleges that they returned their shares at book value in reliance upon Towers Perrin's promise to remain private. This claim fails for the same reasons discussed previously. However, Pao also claims that Towers Perrin breached its fiduciary duty to Principals in the Administrative Solutions division by requiring them to sell back their stock. We write separately to address this claim.

Pao claims that ExcellerateHRO was an "affiliate" of Towers Perrin, and that its employees were eligible to own stock in Towers Perrin under the Bylaws. Specifically, Pao notes that § 6.1.1 states that eligible shareholders include "employees of [Towers Perrin] or any subsidiary or other affiliate of [Towers Perrin] approved for the purpose by the board of directors." As an affiliate of Towers Perrin, Pao asserts that the board of directors could have approved the sale of shares to ExcellerateHRO employees. She claims that the board of directors breached its fiduciary duty by failing to give any consideration as to whether to approve ExcellerateHRO as an "affiliate" of Towers Perrin, thereby providing Principals in the Administrative Services division the opportunity to retain their shares after being transferred to the joint venture. Pao claims this failure was particularly egregious given that the firm had "begun substantial work towards an initial public offering" when the joint venture was created. (Pl. Opp. Mem., p. 44.)

Pao's claim fails as a matter of law because the board of directors of a Pennsylvania corporation does not have a fiduciary duty to individual shareholders.[13] Section 1717 of the Pennsylvania Business Corporation Law ("BCL") provides that the "duty of the board of directors,

_____

[13]To the extent Pao claims that this failure by the board of directors constitutes a breach of contract, that claim is also barred by Pennsylvania's four-year statute of limitations. See 42 Pa.C.S. § 5525(a).

committees of the board and individual directors . . . is solely to the business corporation." 15 Pa.C.S. § 1717. The BCL's suggestion that directors consider a variety of interests and factors, including the "effects of any action upon any or all groups [of shareholders] affected by such action," 15 Pa.C.S. § 1715(a)(1), does not impose "any legal or equitable duties, obligations or liabilities or create any right or cause of action against, or basis for standing to sue, the board of directors." 15 Pa.C.S. § 1717. Further, the duty of the board to act in the best interests of the corporation "may not be enforced directly by a shareholder or by any other person or group." Id. Pao's claim that the board of directors breached its fiduciary duty is precluded by the plain language of the BCL. See also Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co., 2007 WL 2345281, at * 9 (E.D. Pa. Aug. 15, 2007) ("The plain language of the statute precludes a direct suit for breach of fiduciary duty" by a shareholder against the board of directors.).

## IV.    Conclusion

For the reasons stated, the Court concludes that Plaintiffs have failed to identify any evidence sufficient to create a material issue of fact, and their claims fail as a matter of law. Accordingly, Defendants' motion for summary judgment will be granted.[14]

Our Order follows.

---

[14]Defendants have also filed motions to strike certain declarations and statements of fact offered by Plaintiffs in response to the motion for summary judgment. (Doc. Nos. 139, 140 and 142.) Even considering that evidence, we find that summary judgment is appropriate. Accordingly, Defendants' motions to strike will be denied as moot.